GRAHAM *v.* GENEVA LAKE CRAWFORD MANUF'G CO.

*(Circuit Court, E. D. Wisconsin.* October 11, 1880.)

1. PATENTS—APPLICATION—OMISSIONS IN CLAIM.

Where a person makes an invention, and describes it with other matters of invention in an application for a patent, and a patent issues for such other matters, this fact alone will not preclude him from applying for and obtaining another patent covering the invention described but not claimed in the first application.

2. SAME—APPLICATION AND AMENDED APPLICATION CONSIDERED AS ONE.

Where an application is made for a patent, and is afterwards amended by the withdrawal of parts of the invention, and a second application is filed claiming such parts, and patents afterwards issue on both, the two applications will be considered as parts of one continuous proceeding.

3. DOCTRINE OF RELATION—CONTINUITY OF APPLICATION.

In such case the continuity of the proceedings, originating in the first application, will be considered unbroken in determining when the two years begin to run in which the invention claimed on the second application could be sold and publicly used without invalidating such patent.

4. SALE OR PUBLIC USE, WHEN NOT TO INVALIDATE—TESTING UTILITY.

If necessary, in making tests, an inventor may sell a machine on trial, so as to get it fully and fairly tested, in practical use, by the class of persons for whose use it is intended, and such sale or use, even for more than two years, if made for the purpose of practical test, will not be a sufficient sale or public use to invalidate the patent.

5. PLEADING—PARTIES—WANT OF TITLE.

The objection that a suit cannot proceed because all the parties claimed to have an interest are not joined as complainants, is not favored when the title claimed to be vested in the parties not joined is disputed, and there are serious doubts as to whether they actually own any interest whatever, and especially. so when such objection is made by a party charged with infringement.

6. SAME—DISCLAIMER.

A party alleged to have an interest in a patent sued on may disclaim all interest in favor of complainant, and thus obviate the objection that he should be joined as a party.

7. INFRINGEMENT—FORMAL DIFFERENCES.

Where there are differences merely in the form and not in the substance, and defendant's machine really shows the various parts described in complainant's patent, it is an infringement.

8. SAME—EQUIVALENTS.

Where the various parts of defendant's machine exhibit mechanical parts equivalent to those in complainant's machine, and producing the same result, an infringement is established.

9. SAME—GRAHAM HARVESTER, No. 74,342.

The first and second claims of the Graham harvester patent of February 11, 1868, No. 74,342, *held* to be valid, and infringed by the Burdick & Le Roy patent of November 12, 1872, No. 133,013.

In Equity.

*Banning & Banning,* for complainant.

*Flanders & Bottum,* for defendant.

DYER, D. J.   This is a bill in equity to restrain the alleged infringement of a patent issued to Alvaro B. Graham, February 11, 1868, for an improvement in harvesters.   The complainant is assignee of the patentee, and there are involved in the present controversy the first and second claims of the patent.   These claims are as follows:

"(1) The combination, as set forth, in a harvester, of the finger-beam with the gearing carriage, by means of the vibratable link, the draught-rod, and the two swivel-joints, M and M ', so that the finger-beam may both rise and fall at either end, and rock forward and backward.   (2) The combination, as set forth, in a harvester, of the finger-beam, gearing carriage, vibratable link, draught-rod, swivel-joints, and arm, by which the rocking of the finger-beam is controlled."

Several defences are interposed, but before passing to their consideration it may be well to state that the validity of the patent was involved in the case of *Graham* v. *Gammon,* 7 Biss. 490, and has also since been passed upon in the northern district of Illinois in the case of *Graham* v. *McCormick,* (unreported,) which was heard by the circuit judge, and the district judge by whom the present case is decided, sitting together; and most of the questions here involved have

been passed upon, after most elaborate argument, in the *McCormick Case*.

Further, as preliminary to the consideration of the grounds of defence urged by the defendant, it is important to state, as part of the history of this patent, that the application for the patent was first made February 25, 1864, by placing it in the hands of solicitors in New York, to be by them presented to the patent-office. The application was not, however, in fact filed until December 2, 1865.

In its original form it contained five claims, the first of which related to the invention now in suit, and the last four to other improvements. The first three claims were rejected by the patent-office, December 30, 1865, and an offer was then made to allow the other two claims. This offer was not accepted, and an amended claim was filed March 24, 1866, in place of the first rejected claim. This claim, which had reference to the invention now in controversy, was rejected April 4, 1866. While the first application was still pending, and on the eleventh of February, 1867, a second application was filed, containing, among other things, the two claims now in suit. In June, 1867, the claims which embrace the present invention were withdrawn from the first application, and a patent was issued on that application July 23, 1867, but that patent did not include the invention now in question. A patent for that invention was issued on the second application, February 11, 1868. The original specifications and drawings, which accompanied the first application, contained a description of the invention now under consideration.

It is insisted, first, that complainant's patent is invalid because, previous to its issuance, the patentee had procured a patent to himself and others as his assignees, in the specifications and drawings of which the invention now in question was described and delineated, and that, therefore, the prior patent (meaning the patent of 1867) can be re-issued so as to cover all that was invented by the applicant for the patent in suit; and also that the inventor, A. B. Graham, prior to his application for the patent of 1868, applied for the patent of 1867, in which application he set forth, but did not claim, the invention now in controversy, and that, by his failure at that time to make such claim, he impliedly admitted his device to be old, and was thereby estopped from afterwards claiming the same to be new in any subsequent application.

In the *McCormick Case* the court had occasion to consider this objection, and it was held untenable. It was there decided that it was not a proper case for reissue; that there was no defective or in-

sufficient specification; and that the inventor had not claimed more than he had a right to claim as new.   In the opinion, delivered by *Drummond,* J., it is said:

"On general principles we think that where a person has, within the meaning of the patent law, made an invention which he has described in specifications, including other matters of invention, for which last a patent has been issued, that he should not be precluded for that reason alone from applying for and obtaining a patent for that which was not claimed in the first patent.   The object of the patent law was to protect a party who made an invention which was useful, provided he complied with the terms of the law and a patent issued for the invention; and unless there is something in the law which declares a patent issued under such circumstances to be invalid, it is the duty of the courts to sustain a patent for an invention thus made.   It is to be borne in mind that the application for the second patent, that of 1868, the one in controversy here, was made while that for the previous patent was pending, and before the prior patent had been issued.   There were thus pending before the patent-office two applications at the same time, where the claims were different, and we understand it to be in accordance with the practice of the patent-office to allow applications to be made at the same time, by the same party, for different parts of the same machine."

In this connection, and as bearing upon this question, I refer to *McMillan* v. *Rees,* 17 O. G. 1222.

The further ground of defence is urged that the patent in suit is invalid because the alleged invention was, with the inventor's consent and allowance, in public use and on sale for more than two years prior to his application for a patent therefor.

This defence was also interposed in *Graham* v. *McCormick, supra,* and we had occasion there to consider it.   It was there held that, for the purpose of fixing the time when the two years began to run, the application for the patent in suit should be treated as a continuation of the first application, filed December 2, 1865; and that "the continuity of the proceeding which originated in the first application was not broken, up to the time when the patent for the invention in suit was granted in 1868."   From this conclusion it would follow that the two years within which the invention could be sold and publicly used without invalidating the patent, began to run December 2, 1863, which was two years prior to the filing of the first application.

Some testimony bearing upon the defence under consideration has been taken in the case at bar, and in addition thereto, by stipulation, the testimony upon the same subject, taken in the case of *Graham* v. *McCormick,* has been submitted.

The only machine made in 1863 by Graham, the inventor, which is clearly proved to have been sold, was delivered on trial; and the transactions of the inventor in that year, by which his then unperfected invention was brought into notice, as was stated by the court in *Graham* v. *McCormick*, "should be regarded rather in the light of a use of the invention for such practical tests as the law permits an inventor to make, than as such a public sale or use as is contemplated by the statute. At that stage of the inventor's work his invention was largely in experiment and trial. It could only be tested by practical use in the field, and it was essential that it should be so tested by farmers on their farms. The inventor was then struggling, as inventors often do, to establish the success of his invention. It was necessary that thorough experimental tests should be made, and that he should have the assistance of others in making them; and it is manifest, we think, that the machines of 1863 were not yet so perfected as to be practical machines, capable of successful work."

I am aware of the opinion of Judge Lowell in *Henry* v. *Francestown Soap-stone Stove Co.* 17 O. G. 569, and of his disagreement with Judge Shepley, who delivered an opinion in the same case, reported in 9 O. G. 409; but, upon consideration of all the testimony, I conclude that what was done by the patentee, Graham, "with reference to the use of the machines in 1863, was intended by him, and was, in fact, for the purpose of experiment and as a test of the machines with a view to their perfection. This part of the defence rests upon a claim of forfeiture of rights secured by the patent. To justify the court in sustaining it the proof should be clear and satisfactory. The right of the infringer to invalidate the patent for this cause should be undoubted." *Graham* v. *McCormick*. I must hold this defence insufficient to invalidate the patent.

Attack has been made upon complainant's title to the patent in question, and therefore upon his right to maintain this action.

In November, 1865, the inventor, A. B. Graham, made a contract with W. B. & C. A. Werden, granting to them the exclusive right to manufacture and sell the improvement in the machine in question, and providing that such right should continue until the patent about to be applied for should expire. By this contract Graham also agreed that before a patent should be obtained he would make such an assignment to the Werdens as would secure an issuance of the patent to all three of the parties jointly, each to have an undivided one-third interest therein. This, of course, was merely *an agreement* to assign, but at the same time, viz., November 25, 1865, an assignment was

executed by Graham to the Werdens by which the full and exclusive right to the invention described in specifications then prepared and executed, preparatory to obtaining letters patent, was granted to the Werdens, the same to be held and enjoyed by them "to the full end of the term for which the said letters patent may be granted, as fully and entirely as the same could have been held and enjoyed by him [Graham] if this assignment and sale had not been made."

This, it is to be observed, occurred before either the first or second patent was obtained. It is, nevertheless, contended that the language of this assignment is so broad as to vest in the Werdens an interest in the invention covered by the patent of 1868, and therefore that the present action cannot be maintained by complainant. It is also to be observed that the patent of 1868 was issued to Graham alone, and that there was thereafter no further assignment of any interest in that patent made to the Werdens.

There is evidence tending to show that the contract before referred to, made between Graham and the Werdens, was virtually abandoned by the latter, and that a controversy arose between the parties, which has ever since existed, upon the question as to whether the Werdens have not forfeited their rights and interest even in the patent of 1867. It is evident that there is a serious controversy between the parties upon that question; and without here determining what are its precise merits, and what are the rights of the Werdens, if any, in either the patent of 1867 or 1868, I am of opinion, as was the court upon the same question, in *Graham* v. *McCormick, supra,* that "whatever equities there may be between the parties to the contract of November, 1865, can be adjusted in a controversy between themselves." And as the patent of 1868 was issued to Graham alone, and as no additional assignment of any interest was thereafter made to the Werdens, and since, in view of the controversy between these parties, grave doubts may well exist as to whether the Werdens can claim any interest in the invention covered by that patent, I am of opinion that such controversy and doubt ought not, in this suit, to be resolved in favor of the Werdens; especially as the present objection comes from a third party, the present defendant, who is claimed to be an infringer of the patent.

The defendant further insists that the idea or principle involved in the patent in suit, and which is developed in a combination which enables the finger-beam of the harvester to both rise and fall at either end, and rock forward and backward, is old, and is shown in the fol-

lowing letters patent, to-wit: the Dolph patent, issued in 1857; the Zug patent, issued in 1859; the Dodge patent, issued in 1865; the Bartlett & Dodge patent, issued in 1862; the De Witt patent, issued in 1862; the Ball patent, issued in 1859; the Aultman patents, issued in 1858 and 1859; the Bramer patent, issued in 1865; the Ray & Grant patent, issued in 1865; and the Russell patent, issued in 1861.

Of these, the Dolph, the Zug, the Ball, and the Bartlett & Dodge patents were considered by *Blodgett*, J., in *Graham* v. *Gammon, supra,* and were held by him as not embracing the Graham device or combination. The Ball and Zug machines were also severally considered by the court in the case of *Graham* v. *McCormick, supra,* and it was there held that there was nothing in either of those machines to prevent or invalidate the combination named in the first two claims of complainant's patent. And by the conclusions thus arrived at in those cases, with reference to these several patents, I feel bound.

The Aultman patents, the last of which was a reissue, do not anticipate the Graham invention, because they do not, I think, provide for any rocking motion. They only provide for a movement by which the finger-bar may be raised and lowered at either end, or folded over for transportation; and I cannot, from the specifications and drawings, find that they contain the Graham swivel-joints, or the arm for rocking the finger-bar.

The same must be said of the De Witt device, which is one for raising and holding a flexible cutter-bar so as to pass over an obstruction, and at the same time allow it to fall below the level of the wheels, and to render it firm, so that it cannot be depressed at any point of its elevation. The rocking feature, which is the essential element of the Graham machine, is wanting.

The nature of the Dodge invention, as stated in his specifications, "consists in a novel manner of constructing the main frame of the machine, and of the arrangement of the gearing in connection therewith. It further consists in a novel arrangement of the devices for lifting the cutting apparatus, and also in a self-adjusting pair of pulleys, to be used in connection with the reel." I do not perceive that this patent can be regarded as at all anticipating or limiting the Graham claims now in suit.

In the Russell machine, the finger-bar may be raised and lowered; but the character of the mechanism, in respect of arrangement of parts, is such, so far as I can judge, as to deprive the finger-bar of a rocking motion. I cannot discover that the drawings show either

the swivel-joints in Graham's machine, or the arm for controlling the motions of the finger-bar.    Nor do I think that the Graham machine is anticipated by either the Ray & Grant patent, or the Bramer patent.

The remaining, and, as I consider, the most important question in this case, is, does the defendant's machine infringe complainant's patent?    The Graham invention, as it is covered by the first claim, consists of a combination composed of six parts, namely, the gearing carriage, finger-bar, vibratable link, draught-rod, and swivel-joints, M and M'; and the arrangement of the combination is such as to permit the rising and falling at either end, and the rocking forward and backward, of the finger-bar.    The second claim embraces the same combination with one additional part, which is the arm or lever by which the rocking of the finger-bar is controlled.    As was stated by the court in *Graham* v. *McCormick*, "the object of the invention, as set forth in these two claims, seems to be mainly to produce the rocking motion of the finger-beam, as described, and by the method described."

The complainant's mechanism consists of the so-called vibratable link, which extends from the shoe to which the cutter-bar is attached backward, and in the rear of the frame, to a bracket or short arm which is fastened to the frame of the machine, and this vibratable link is connected with the bracket by means of a swivel-joint, identified in complainant's patent as M.    Then there is a draught-rod extending from the forward end of the shoe to the forward beam of the main frame, and running forward outside the wheel of the gearing carriage.    It is connected with the forward end of the shoe, and with the vibratable link, by what the patentee calls a swivel-joint, M', but which appears to be rather a hook than a swivel-joint connection. Then there is a vertical arm extending upward from the vibratable link, which is connected by a rod extending forward, with a lever, by working which backward and forward the driver may control the tilting and rocking movement of the finger-beam, this movement being dependent upon the free play of the joints at M and M'.

Now, the question is, does the defendant, in order to produce the rocking motion in its machine, employ a combination of parts which is the same as or the equivalent of complainant's?

Defendant claims under a patent issued November 12, 1872, to Burdick & Le Roy.    In the specifications of this patent it is stated that the "invention consists in a novel manner of constructing, attaching, and bracing the inner or main shoe; in a novel arrange-

ment of devices for rolling the bar edgewise, in order to change the height of cut as may be necessary, as hereinafter more fully explained." The machine, as appears from the specifications and drawings, consists of a solid frame, the main axle on which the frame is mounted, and the wheels, "all of which parts are constructed and arranged in the ordinary manner." Then there is a shoe which is placed forward of one of the wheels of the gearing carriage, which is supported and held at its forward end by means of what the patentee calls a transverse brace, E, and at its rear end by an arm on the side of what is described as a head-block, F; this shoe being provided with two pairs of lugs on its top, between which the arm at the rear end and the brace at the forward end are pivoted. The brace, E, extends crosswise under the frame, and has its outer end swiveled, and mounted loosely on a horizontal rod, G, which is secured lengthwise under the outer side of the frame. It is stated in the specifications that the object of swiveling the end of the brace, and mounting it on the rod, is to permit it to move forward and back when the shoe is rocked or tipped.

The head-block, F, consists of a flat, upright plate, provided on its outer side with the arm to which the shoe is pivoted. The head-block is held by two longitudinal bars or braces, L and K, extending backward under the gearing carriage, and also by a rod, R, extending forward and connected to the tongue of the machine. The lower brace, K, has its forward end pivoted to the lower front corner of the head-block, and its rear end pivoted to a rigid depending arm, on the under side of the frame immediately below the axle. The upper brace, L, has its forward end pivoted to the top of the head-block, and its rear end passed through a slot in the rigid depending arm, and is pivoted to an upright hand-lever, the lower end of which is pivoted to the end of brace K, the latter being extended back of the arm before mentioned. As is stated in the specifications, "the two braces serve to hold the head-block securely in position, so that it cannot move either forward or backward, or laterally, while at the same time they permit a free vertical movement, in order that the shoe may rise and fall in conformity with the surface of the ground. By moving the hand-lever, the upper brace, L, is moved lengthwise, and caused to tip the head-block backward or forward, as the case may be, so as to rock the shoe and finger-bar, and change the height of the fingers from the ground."

An examination of defendant's model and machine shows that by grasping the lever which extends upward from the horizontal brace,

L, the movement of the finger-beam may be controlled, and the desired rocking motion produced; which motion is, so far as I have been able to discover, the same motion as that produced in complainant's machine; and in the defendant's machine this motion is dependent upon the free play of the rear or swivel end of brace, E, where it is connected with the main frame, and with the free movement of the connection of the shoe at its forward end with brace, E, and at its rear end with the arm on the side of the so-called head-block—the free play of these last-named connections being facilitated by the two pairs of lugs on top of the shoe. It should be stated, further, that the rod, R, extending forward from the head-block to its connection with the tongue, is connected with the head-block by means of a hook and a sort of staple or clevis, which has a loose and free connection with the head-block.

The mechanism of the two machines in various particulars is quite unlike in form, and this dissimilarity is more apparent from the fact that defendant's machine is one where the cutting apparatus is forward of the axle and wheel; but, as before stated, Graham provides in his specifications for a device as applicable to a forward cut as to a rear cut machine. Upon careful consideration of the question, I am of the opinion that the differences between defendant's and complainant's machines are differences of form and not of substance, and that defendant's machine really shows the various parts described in complainant's patent.

The rod, R, in defendant's machine, connecting the tongue with the head-block, is the draught-rod in complainant's machine. Its connections are by a hook, and not by a swivel-joint. But, in its attachment to the head-block and the brace, L, in connection with the arm by which the rear end of the shoe has its connection with the head-block, it performs the functions of Graham's draught-rod, and is not, so far as I can see, materially unlike the same rod as shown in Sprague's machine, which was held to be an infringement of complainant's in *Graham* v. *Gammon, supra.*

The brace, E, in defendant's machine is the vibratable link in complainant's. It is true that the connection at the rear end with the main frame is not described in defendant's patent as a swivel-joint, but it is described as having that end swiveled and mounted loosely on a horizontal rod, the object of this swiveling and mounting being to permit it to move forward and back when the shoe is rocked or tipped. Its connection with the bracket that is fastened to the frame is loose, and is certainly of the nature of a swivel-joint, and its con-

nection with the shoe is of a similar character; and it clearly performs the functions of the vibratable link in the Graham machine. The formation of the parts which connect the rear end of the shoe with the machine, in connection with which are the longitudinal braces, L and K, is such, certainly, as to permit a swivel-joint movement, although there appears to be in this respect greater complication of mechanism than there is in the Graham machine.

Upon the operation of the upright lever, the movement of the cutter-bar in the two machines appears to be identical, and this movement is produced by substantially, if not precisely, the same co-operation of parts in the two machines.

On examination of the model of the Sprague machine, which it is understood was used on the hearing of *Graham* v. *Gammon*, there can be no doubt that that case was correctly decided; and if the Sprague machine, unlike the Graham machine as it is in various points of construction, is an infringment of the latter, it is exceedingly difficult to see why the defendant's machine is not also an infringment. The various parts of defendant's machine may be said, I think, to exhibit mechanical parts equivalent to those in complainant's machine and producing the same result, and I am of the opinion, therefore, that an infringment is established.

A point was made upon the argument which has not yet been noticed, namely, that the proofs disclose an agreement of some nature between Alvaro B. Graham, the patentee, and complainant, by which the former may be interested in the result of this suit. The patentee has testified that he has the general management of the patent and of litigation connected with it, and that he has an arrangement by which he is to share in a certain percentage of any amounts recovered; and it was insisted, therefore, that this suit could not further proceed unless A. B. Graham was made a party complainant. But A. B. Graham has since filed in the cause, as I think he may be permitted to do, a waiver or disclaimer of all interest in any decree which may be here rendered, and in any sum or sums of money which may be paid by defendant, pursuant to such decree, for the past or future use of the invention in question; and I think he is now, if he was not before, estopped from making any claim against the defendant under the patent in suit, and hence that it is not necessary that he should be made a party complainant.

The case will be sent to a master to assess complainant's damages, and an injunction will issue, according to the usual practice, to restrain further infringement.